UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 7:12-CR-08-SS-ART-HAI-2,4 |
| v. | ) | |
| | ) | |
| BEVERLY LOCKHART, and | ) | RECOMMENDED DISPOSITION |
| MARROWBONE HOMETOWN | ) | |
| PHARMACY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

The Court considers the Motion of Defendant Beverly Lockhart to Suppress Statements Taken in Violation of *Miranda*. D.E. 90.[1] The Motion was referred to the undersigned for a recommended disposition. D.E. 35-1 at 9. On December 18, 2012, the Court conducted an evidentiary hearing on Lockhart's Motion (*see* D.E. 93), which hearing was continued until January 15, 2013, and completed on that date (*see* D.E. 116). The Court granted the parties' request to file post-hearing briefs. D.E. 116. On January 28, 2013, Lockhart filed a Supplemental Memorandum in support of her Motion. D.E. 123. The United States filed its brief on January 30, 2013. D.E. 128. The Court has fully considered the evidence and positions of the parties. Based upon the facts found below, when considered under controlling law, the

---

[1]     Lockhart is a defendant in two pending and related cases: *United States v. Lockhart et al.*, 7:12-CR-8-SS-ART-HAI and *United States v. Varney et al.*, 7:12-CR-9-S-ART-HAI. Although the motion to suppress was initially filed only in 7:12-CR-9, the Court granted Lockhart's motion to incorporate the motion into the record in 7:12-CR-8. D.E. 89.

        This Recommended Disposition mirrors the one entered in 7:12-CR-9, except for the discussion of Marrowbone Hometown Pharmacy's motion to join in Lockhart's motion to suppress. *See infra* Section I.D.

Court **RECOMMENDS** that Lockhart's Motion to Suppress (D.E. 90) be **DENIED**.

## I. DISCUSSION

### A.  Proposed Findings of Fact[2]

The Court is required to analyze the totality of the circumstances based upon the evidence presented.  Much of that evidence establishes undisputed facts.  However, Lockhart's testimony conflicts, in part, with that of two Government witnesses, Bryan Ballman and Amos Adkins.  The dispute centers upon whether Lockhart was given certain non-custodial warnings described by Ballman and Amos Adkins (which she denies), and certain aspects of the manner in which law enforcement conducted the interview.  The Court recognizes that the importance of Defendant's constitutional rights requires careful scrutiny of the Government's witnesses and proof, and that law enforcement personnel are not always truthful.  The Court has carefully evaluated all the evidence presented and the credibility of each testifying witness in light of the legal standards applicable to Lockhart's Motion.

Based upon that careful evaluation, the Court does not credit Lockhart's version of the disputed events for several reasons.  As suggested by the Sixth Circuit, the Court details its reasoning as to this credibility determination.  *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).

First, Ballman and Amos Adkins testified consistently, and the Court credits that testimony.  Notably, these witnesses are employed by two separate law enforcement agencies, one federal and one state.  To discount their consistent testimony, the Court would have to believe that they both testified untruthfully, which, in turn, would have required planned fabricated testimony on a detailed level.  That plan would then have had to be executed with

---

[2]        *See* 28 U.S.C. § 636(b)(1)(B)-(C).

precision in the form of detailed testimony, obviously subject to cross-examination by very capable counsel.  Despite cross-examination of these witnesses, there is no evidence whatsoever of any collusion to present untruthful testimony to the Court.  Importantly, although the Federal Rules of Evidence do not formally apply to suppression hearings, witnesses herein were separated pursuant to Rule 615.  *See* D.E. 96 at 9.  Obviously, the consistent testimony from separated Government witnesses adds to their credibility.

Second, Lockhart's testimony as to the disputed events is undoubtedly self-serving and indicative of exaggeration.   She described herself three times as being "terrified."  D.E. 118 (Transcript of January 15, 2013, Evidentiary Hearing ("Tr. 2")) at 166:1-4, 169:1-3, 170:11-13. Indeed, she indicated she was so "terrified" that she thought she "had to answer their questions or [she] would be arrested."  *Id.* at 166:1-4.  She indicated she was not threatened with arrest, but merely perceived such a threat.  *Id.* at 175:15-17.  But, she also indicated that, when the interview began, the interviewing agents "started out kind of being nice to me, and just asking some general questions."  *Id.* at 164:25-165:2.  She claims "when I did not answer the way that they wanted, then they started raising their voice to me."  *Id.* at 165:2-4.  How she could determine what answers law enforcement "wanted" is unclear.  In truth, Lockhart, having earned a master's degree in secondary education and being therefore very well-educated, strikes the Court as quite a formidable person instead of the terrorized and fragile figure she portrayed at the hearing.

The reasoning above amply supports the Court's credibility determination, and stands on its own.   Additionally, the record includes inconsistent statements on Lockhart's part. Lockhart's Exhibit 2, formally admitted into evidence on her motion, is a Memorandum of Interview that Ballman confirmed preparing, *id.* at 98:11-14, which Amos Adkins corroborated.

*Id.* at 123:16-124:18.   Per the Memorandum, Lockhart initially denied dispensing any drug samples, selling samples, or having pharmacy employees shuck samples from manufacturer packaging.   According to the Memorandum, after speaking with her brother and being advised by him to "tell the truth," Lockhart changed her initial statement, and provided detailed and lengthy incriminating information.   Such inconsistencies further undermine Lockhart's credibility, particularly relative to the Government's witnesses because there are no such inconsistent statements attributable to them in the record.[3]

Having rejected Lockhart's testimony as to certain of the events, the Court makes the following factual findings, with record citations indicating corroboration:

On February 8, 2012, federal and state agents executed a federal search warrant at Marrowbone Hometown Pharmacy, where Lockhart worked as pharmacy technician.   D.E. 96 (Transcript of December 18, 2012, Evidentiary Hearing ("Tr. 1")) at 11:6-8 (M. Bartley); Tr. 2 at 64:5-8 (B. Ballman); *id.* at 163:8-24 (B. Lockhart).   Special Agent Mark Bartley of the Food and Drug Administration was the lead agent on the search warrant, and Bartley, along with 14 other federal and state agents, arrived at the pharmacy between 9:30 and 9:45 a.m.   Tr. 1 at 11:9-11, 13:24-14:4; Tr. 2 at 26:15-27:1 (M. Bartley); *id.* at 114:22-24 (A. Adkins).   The day before search warrant execution, Bartley briefed the participating agents on the individuals employed at the pharmacy, the allegations, and the items listed in the warrant.   Tr. 1 at 11:21-12:3 (M. Bartley); Tr. 2 at 65:3-6 (B. Ballman). Bartley emphasized that the execution "was going to be low, low profile."   Tr. 1 at 12:2-3 (M. Bartley).   He also instructed that no arrests were going to

---

[3]    When discussing the post-hearing briefing, the Court asked defense counsel if the Court is able to rely on the statements in Lockhart's Exhibit 2 as a part of the credibility analysis, inviting identification of any authority preventing such reliance.   Tr. 2 at 192:12-193:15.   No such authority was cited in Lockhart's post-hearing memorandum.

be made that day.  *Id.* at 17:14-22 (M. Bartley); Tr. 2 at 66:20-24 (B. Ballman).  Another meeting occurred the next morning before execution.  *Id.* at 105:4-12 (A. Adkins).

Bartley and Task Force Officer Virgil Ray were the first agents to approach the pharmacy window.  Tr. 1 at 12:11-23; Tr. 2 at 49:17-25 (M. Bartley); *id.* at 68:13-18 (B. Ballman).  They identified themselves to pharmacy employees and asked to speak with Ron Huffman, Lockhart's brother and the pharmacist at Marrowbone.  Tr. 1 at 12:11-16 (M. Bartley); Tr. 2 at 130:14-18 (M. Adkins); *id.* at 164:1-7 (B. Lockhart).  As they were led back to Huffman's office, the remaining agents entered the pharmacy.  Tr. 1 at 12:15-13:6 (M. Bartley); Tr. 2 at 130:19-22 (M. Adkins).  Some of the agents were dressed in "street clothes" with badges identifying them as law enforcement, while others were in uniform or wore vests or blazers identifying them as officers of a particular agency.  Tr. 1 at 13:7-17; Tr. 2 at 28:17-22 (M. Bartley); *id.* at 67:18-68:9 (B. Ballman); *id.* at 108:1-12 (A. Adkins); *id.* at 168:19-23 (B. Lockhart).  Although most of the agents were armed, Bartley indicated that at least six members of the search warrant team were not carrying weapons that day.  *Id.* at 28:23-29:2, 43:6-19, 44:12-19 (M. Bartley).  No weapons were drawn upon the agents' entry into the pharmacy or at any point throughout the course of the day.  Tr. 1 at 13:18-23; Tr. 2 at 47:9-11 (M. Bartley); *id.* at 68:10-12, 72:22-24 (B. Ballman); *id.* at 108:19-21 (A. Adkins); *id.* at 172:3-6 (B. Lockhart).  Although, pursuant to Bartley's direction, the pharmacy was closed to regular business, some previously filled prescriptions were dispensed during the day.  *Id.* at 35:16-36:12 (M. Bartley).

Bartley's intention, in planning the search warrant execution, was to have two agents interview each employee of Marrowbone while other agents were searching the premises.  *Id.* at 30:1-19.  Agent Bryan Ballman of the FDA and Detective Amos Adkins of the Kentucky State Police were involved in interviewing Lockhart.  *Id.* at 65:10-13 (B. Ballman); *id.* at 105:15-20

(A. Adkins).  Within a minute or two of entering the pharmacy, Ballman and Amos Adkins met Lockhart in the main room of the pharmacy and introduced themselves.  *Id.* at 69:4-16 (B. Ballman); *id.* at 106:8-12, 107:1-11 (A. Adkins).  They told her they would like to speak with her about certain events at the pharmacy, and asked for a private place where they would not be disturbed to talk.  *Id.* at 69:16-20, 71:8-23 (B. Ballman); *id.* at 107:12-25 (A. Adkins).  Ballman, Amos Adkins, and Lockhart proceeded to the break room—off to the left of the main pharmacy—where Lockhart indicated they could sit.  *Id.* at 71:10-13 (B. Ballman); *id.* at 107:20-25 (A. Adkins).  Ballman was dressed in "raid gear," which includes cargo pants, a "raid jacket" with the lettering "Federal Agent" or possibly "OCI," a holstered weapon, handcuffs, and extra magazines.  *Id.* at 67:18-68:12 (B. Ballman); *id.* at 168:19-23 (B. Lockhart).  Amos Adkins, meanwhile, was wearing jeans, a "street clothes-type" shirt, and a gun belt containing a holstered weapon and extra magazines, as he had removed his tactical vest prior to the interview.  *Id.* at 108:1-21, 109:1-7  (A. Adkins).

At the beginning of the interview, Ballman informed Lockhart that they were conducting a "non-custodial" interview, that she had the right to leave, that she did not have to answer any questions, and that she was not going to be arrested.  *Id.* at 69:16-70:1, 84:3-15, 88:16-89:14, 99:20-100:9 (B. Ballman); *id.* at 109:21-110:5 (A. Adkins).  Ballman and Amos Adkins did not ask Lockhart any questions prior to informing her of the non-custodial nature of the interview and her rights as described above.  *Id.* at 89:15-21 (B. Ballman); *id.* at 109:24-110:15 (A. Adkins).  They began the interview by asking Lockhart general questions and obtaining her personal information.  *Id.* at 110:7-15 (A. Adkins); *id.* at 164:23-165:2 (B. Lockhart).

The interview with Lockhart lasted approximately 2.5 to 3 hours.  *Id.* at 86:8-13 (B. Ballman); *id.* at 166:8-12 (B. Lockhart).  After about 2 hours had passed, Ballman and Lockhart

went to an adjoining room where Ron Huffman, Lockhart's brother, was being interviewed. *Id.* at 75:24-76:13 (B. Ballman); *id.* at 113:5-12 (A. Adkins); *id.* at 166:25-167:8 (B. Lockhart). After a brief conversation in that room, Ballman and Lockhart returned to the break room, where her interview continued for approximately an additional 30 minutes. *Id.* at 76:13-15, 78:22-24 (B. Ballman); *id.* at 113:21-25 (A. Adkins); *id.* at 167:8-10 (B. Lockhart). At that point, the interview was concluded, although Ballman was notified by another agent about 30 minutes later that Lockhart wished to speak with him again. *Id.* at 78:22-79:6, 80:10-81:24 (B. Ballman). They recommenced the interview in the same location, and Lockhart provided additional information. *Id.* at 80:10-15, 81:17-22 (B. Ballman).

The break room contained a small table and some chairs, where Lockhart and the agents sat throughout the interview. *Id.* at 77:24-78:12 (B. Ballman); *id.* at 107:20-25 (A. Adkins). Although the door to the break room was closed, it was often opened as individuals moved through the break room to get to the storage room. *Id.* at 125:17-126:8 (A. Adkins); *id.* at 166:13-24 (B. Lockhart). Lockhart was never threatened with arrest during the interview or during the course of the day. Tr. 1 at 14:22-24 (M. Bartley); Tr. 2 at 73:13-14 (B. Ballman); *id.* at 175:10-17 (B. Lockhart). She never saw a firearm removed from its holster, nor did law enforcement threaten her with a firearm. *Id.* at 73:10-12 (B. Ballman); *id.* at 172:7-11 (B. Lockhart). The agents did not place her in any type of restraint, nor did they threaten to restrain her. *Id.* at 73:1-3, 7-9 (B. Ballman). She was not searched during the interview or at any time that day. *Id.* at 70:17-18 (B. Ballman); *id.* at 110:24-111:4 (A. Adkins); *id.* at 173:12-14 (B. Lockhart). Lockhart did not request to use her cell phone or the pharmacy phone. Tr. 1 at 23:12-15 (M. Bartley); Tr. 2 at 70:15-16, 72:9-11, 81:10-12 (B. Ballman); *id.* at 110:20-23, 111:15-17 (A. Adkins); *id.* at 165:23-24, 176:17-23 (B. Lockhart). She never asked for permission to speak

to an attorney or to speak to another employee.  *Id.* at 73:15-18 (B. Ballman); *id.* at 110:16-19, 111:18-22 (A. Adkins); *id.* at 176:13-18 (B. Lockhart).[4]

Lockhart was often distraught and emotional, began crying during the interview, but did not appear confused.  *Id.* at 42:9-13 (M. Bartley); *id.* at 75:20-76:2 (B. Ballman); *id.* at 111:23-112:5 (A. Adkins).  However, she never expressed a need to leave the interview or the premises.  Tr. 1 at 23:19-21 (M. Bartley); Tr. 2 at 70:9-11, 72:18-21, 80:4-7, 81:7-9 (B. Ballman); *id.* at 176:7-9 (B. Lockhart).  Neither Ballman nor Adkins advised her of her rights under *Miranda*.  *Id.* at 99:15-19 (B. Ballman); *id.* at 121:10-12 (A. Adkins); *id.* at 168:9-11 (B. Lockhart).

During the course of Huffman's interview, FDA Agent Kevin Berada and KSP Detective Randy Hunter became concerned about Huffman's mental state, and expressed to Bartley that they feared Huffman may hurt or kill himself.  Tr. 1 at 15:13-16:3 (M. Bartley).  Bartley was particularly troubled by this information because upon his initial entry into Huffman's office, he had observed two firearms—one on the left side of Huffman's desk and another on an adjacent shelf.  *Id.* at 16:3-8 (M. Bartley).  Lockhart also expressed concerns for her brother, stating that the current situation was going to destroy and ruin him, and that he might harm himself if someone did not watch him.  *Id.* at 20:11-14 (M. Bartley); Tr. 2 at 79:9-20 (B. Ballman); *id.* at 122:1-17 (A. Adkins).  Bartley spoke with an attorney for the United States, and they determined that they could not in good conscience leave Huffman at the pharmacy given his current mental state.  Tr. 1 at 16:16-22 (M. Bartley).

As a result, Officer Ray contacted a state district judge in the county and obtained a

---

[4]     The United States, citing testimony from the agents at both evidentiary hearings, notes that if Lockhart had asked to use a phone, leave the premises, or speak to an attorney, she would have been permitted to do so.  D.E. 128 at 5.  Instead of hypothetical events, the Court's focus is on the facts established by the evidence.

mental health warrant. *Id.* at 16:23-17:5 (M. Bartley). Pursuant to that warrant, Huffman was transported from the pharmacy so that he could receive help. *Id.* at 17:5-7 (M. Bartley); Tr. 2 at 82:12-21 (B. Ballman). This occurred after Lockhart's interview was complete. *Id.* at 82:22-25 (B. Ballman). Bartley took possession of the firearms in Huffman's office, and he eventually returned them to Lockhart. Tr. 1 at 19:7-23 (M. Bartley); Tr. 2 at 179:24-180:18 (B. Lockhart). Bartley stated that he did not take the weapons because they were not listed in the warrant, but that he could not, in good conscience, turn them over to Huffman. Tr. 1 at 20:5-10 (M. Bartley). Therefore, he gave them to Lockhart. *Id.* at 19:20-20:10 (M. Bartley).

After the conclusion of her interview, Lockhart remained on the pharmacy premises for the remainder of the day. Tr. 2 at 81:25-82:3 (B. Ballman). Law enforcement left the premises when the search warrant execution was complete—sometime shortly after 5:00 p.m. Tr. 1 at 13:24-14:6; Tr. 2 at 52:6-15 (M. Bartley). Lockhart stayed on site until the agents departed because she had to lock the pharmacy. *Id.* at 42:5-8 (M. Bartley); *id.* at 170:14-17 (B. Lockhart).

In finding these facts based upon the credibility analysis discussed above, the Court rejects Lockhart's testimony as to the following events: (1) that Ballman "took" her to the break room, *id.* at 164:10-12; (2) that Ballman did ***not*** give her the non-custodial warnings that she had a right to leave, she did not have to answer their questions, and she was not going to be arrested, *id.* at 165:5-10, 14-16; (3) that she was not allowed to make telephone calls during the interview, *id.* at 165:20-22; and (4) that Ballman "very roughly" took her by the arm to see her brother, *id.* at 167:4-7.

### B. Applicable Law

Lockhart's Motion to Suppress attached her Affidavit in which she states that, based upon various described events, "I believed at all times that I was in custody." D.E. 90-1 at 2. The

Court then scheduled a hearing on the Motion, indicating "based on the Court's assessment that the United States bears the burden to prove compliance with *Miranda* and voluntariness, the United States should be prepared to present all evidence supporting its opposition to the Motion." D.E. 91. *See* Laurie Levinson, *Federal Criminal Rules Handbook* 690 (West 2013) (stating "Once a *Miranda* violation is claimed and the defendant alleges facts demonstrating that he or she was in custody and subject to interrogation, the burden is on the prosecution to prove by a preponderance of the evidence that *Miranda* was complied with and that any confession was voluntary.")

At the outset of the hearing, the Court noted the varying burdens, counsel for Defendant indicated he believed the burden was upon the Government, and counsel for the Government indicated "our burden is a preponderance of the evidence to establish that the confession was voluntary and appropriate." D.E. 96 at 5. As the evidence developed, however, the only issue became whether Defendant was in custody triggering the application of *Miranda*. The Sixth Circuit has held "[i]n a suppression hearing, the burden of proof or persuasion rests with the party seeking to suppress the evidence." *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 88-2135, 1989 WL 153161, *5 (6th Cir. Dec. 18, 1989). Thus, "[w]here a party seeks suppression of his statements based upon a failure to receive his *Miranda* warnings, he must demonstrate by a preponderance of the evidence that he was entitled to receive them; *i.e.*, that he was subjected to a 'custodial interrogation.'" *Id.* (citations omitted). Here the United States effectively assumed the burden and the defense (not surprisingly) agreed with that allocation. D.E. 96 at 4-5.

Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In

10

*Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court set forth certain procedural safeguards to secure this right.  Accordingly, prior to interrogating an individual in custody, law enforcement must warn that individual:

> that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Absent this warning, any statements "stemming from custodial interrogation of [a] defendant" are not admissible in a subsequent trial.  *Id.*

A custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.*  The United States does not dispute that *Miranda* warnings were not given, nor does it dispute that Lockhart was interrogated.  Tr. 2 at 190:4-14.  Thus, the only issue before the Court is whether Lockhart was in custody so as to require *Miranda* warnings that were, admittedly, not given.  *See id.* at 190:15-24.

An individual is in custody, for the purpose of *Miranda*, when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).  However, "'a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment.'"  *Id.* (quoting *Mathiason*, 429 U.S. at 495) (internal quotation marks omitted).  This is because "'any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'"  *Id.* (internal markings omitted).

11

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Indeed, "'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). To answer this question, courts look to the totality of the circumstances. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2002). However, the Sixth Circuit has pointed to several factors to guide a court's analysis of whether an individual is in custody: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Swanson*, 341 F.3d at 529).

### C. Analysis

The first factor, the location of the interview, weighs in favor of the United States. Lockhart was questioned in the break room of the pharmacy where she was employed, a location that was not "hostile" or "coercive." *See Swanson*, 341 F.3d at 529. Having worked at the pharmacy with her family, she was familiar with her surroundings, and the environment was comfortable. Ballman noted, "It was a normal environment like this, heating, air, that type of situation. It was more or less an office with a small table and some chairs around it. That's where we sat." Tr. 2 at 78:4-7. The break room was small, as was the pharmacy itself, and the door to the room was mostly closed throughout the interview, factors that arguably weigh in Lockhart's favor. However, individuals often opened the door and traveled through the break room to the storage room, so Lockhart was not completely isolated from the remainder of the pharmacy. Courts have found non-custodial interrogations where individuals were questioned in

12

far more hostile environments.  *See Swanson*, 341 F.3d at 529 (summarizing several cases where individuals questioned at police stations were found not to be in custody).  On balance, the location of the questioning was familiar to Lockhart and non-threatening, weighing in favor of a non-custodial setting.

The next factor, the length and manner of questioning, is somewhat mixed, but on the whole weighs in favor of the United States.  Before asking Lockhart any questions, Agent Ballman informed her that she was not going to be arrested.  This is a significant factor favoring a finding that an individual is not in custody.  *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) ("Perhaps most significantly, Agent Williamson specifically advised Salvo [the defendant] that he was not under arrest. . . .   Several cases indicate that such a statement by a police officer is an important factor in finding that the suspect was not in custody."); *see also Mathiason*, 429 U.S. at 493-95 (holding that the defendant was not in custody when he was interviewed at the police station and was specifically told he was not under arrest); *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (noting that the record would not support a finding that the defendants were in custody when the agent repeatedly told them they were not under arrest and were free to terminate his questioning at any time).

Further, although both Ballman and Amos Adkins were armed, they never brandished their firearms or even removed them from their holsters.  Lockhart was not searched.  While the door to the break room was sometimes closed, it was unlocked.  These factors weigh in favor of finding that Lockhart was not in custody.  *See United States v. Crossley*, 224 F.3d 847, 861-62 (6th Cir. 2000) (holding that the defendant was not in custody when she was interviewed in an unused classroom at her place of employment, the agents did not tell her that she could not leave, she was not restrained and was sitting next to the closed, unlocked door, and the agents never

brandished a firearm); *see also United States v. Mahan*, 190 F.3d 416, 420-22 (6th Cir. 1999) (finding that the defendant was not in custody when he was interviewed in a conference room and then an office at his place of employment, he was not threatened with arrest, both interview rooms were unlocked, and the agent did not brandish a firearm or handcuffs). Moreover, the interview was briefly terminated when Ballman accompanied Lockhart into the adjoining room to speak with her brother, indicating a lack of confinement.

Although Amos Adkins was in regular "street clothes," with the exception of his gun belt, Ballman was in uniform, a factor that weighs in Lockhart's favor. The interview lasted 2.5 to 3 hours, which, while not overly burdensome, favors Lockhart somewhat. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (noting that a 2-hour interview favored the view that the defendant was in custody); *but see United States v. Banks*, No. 09-34-ART, 2010 WL 1451357 at *4 (E.D. Ky. April 9, 2010) (stating that a 2-3 hour interview does not suggest that the interview was custodial). However, given that the search took nearly an entire day indicating a complex investigation, this interview length does not strike the Court as so long as to indicate excessive coercion. When viewed in totality, the length and manner of questioning slightly favors the United States.

The third factor, whether Lockhart possessed unrestrained freedom of movement during the interview, supports a finding that she was not in custody. Lockhart was never handcuffed or otherwise restrained, and she was never threatened with restraint. Agent Ballman told her at the beginning of the interview that she had a right to leave. She was never told she could not leave to go the restroom or make a phone call. The break room door was often closed during the interview, but being in a closed room even in a police station is not an "indication that the questioning took place in a context where [the suspect's] freedom to depart was restricted in any

way." *Mathiason*, 429 U.S. at 495.  This factor favors the Government.

The final factor, whether Lockhart was told she need not answer any questions, also weighs heavily in favor of the United States.  At the beginning of the interview, Agent Ballman told Lockhart that she was free to leave, that she did not have to answer any questions, and that she was not going to be arrested.  Whether an agent tells an individual that she does not have to answer any questions and can terminate the interview at any time "is a particularly important factor in showing that no custody occurred."  *Panak*, 552 F.3d at 467-68.  Although not a necessary condition, this advice is "frequently sufficient" to find that the interview was conducted in a non-custodial setting.  *Id.* at 467.  Indeed, "[i]n 2004, the Eighth Circuit observed that it was unable to find a single precedent from the Supreme Court of the court of appeals— save for a 1982 Ninth Circuit decision 'decided under an outmoded standard of review'—that 'holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.'"  *Id.* at 468 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)).  Although Lockhart testified that she felt compelled to answer the agents' questions out of fear of being arrested, Ballman's statements clearly advised her otherwise.  Lockhart's argument that the Memorandum of Interview (Lockhart Exhibit 2) does not state that the non-custodial warnings were given does not undermine the Court's conclusion that Ballman and Amos Adkins, who were separated, testified truthfully.  Additionally, after the initial questioning was complete, Lockhart notified another agent that she wished to speak to Ballman again, and she then came back to Ballman with additional information.  This suggests she actually did ***not*** feel compelled to answer the agents' questions, but instead was free to stop or initiate contact when she chose.  This fourth factor strongly supports a finding that Lockhart was not in custody.

Lockhart makes several arguments that are not persuasive.  When considered in isolation,

some of those arguments present factors favoring a finding that she was in custody.  However, when added to the totality of the circumstances, those isolated factors do not sufficiently favor Lockhart so as to materially affect the analysis of the four factors discussed above.  Moreover, when the cases Lockhart cites are reviewed in detail, they are readily distinguishable so as to reduce their persuasive effect.  Each argument and case will be separately addressed, but has been considered by the Court as a part of the totality of the circumstances.

Lockhart first points out that fifteen agents conducted the search, which she argues was an overwhelming number for a small pharmacy with five employees.  D.E. 123 at 7.  She cites to case law finding interrogations during searches with fewer agents to be custodial.  *Id.*  While the Court agrees that the overall number of agents weighs in Lockhart's favor, the number was reasonable given the goals of the search and several important facts distinguish the cases she cites from the case herein.  In *Orozco v. Texas*, 394 U.S. 324 (1969), one of the interrogating officers testified that the defendant "was under arrest" and he was "not free to leave" when he was questioned by four police officers in his bedroom.  *Orozco v. Texas*, 394 U.S. 324, 327 (1969).  Certainly this differs from the case at hand, where Ballman specifically told Lockhart that she was ***not*** under arrest and she ***was*** free to leave.  While the defendant in *Orozco* was questioned by all four officers, *id.* at 325, Lockhart was interviewed by only two.

In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), also cited by Lockhart, eight law enforcement officers and two non-agents executed a search warrant at the defendant's residence on an Air Force base.  *United States v. Craighead*, 539 F.3d 1073, 1078 (9th Cir. 2008).  All of the agents were armed, and some of them brandished their weapons in the defendant's presence.  *Id.*  The defendant was interviewed by two agents in a storage room with the door closed, and he testified that one of the agents was leaning with his back to the door in

such a way to block the defendant's exit. *Id.* at 1078, 1086. In order to leave the storage room, the defendant would have had to move the agent or ask him to move. *Id.* at 1086. Lockhart testified, on the other hand, that she never saw an agent brandish a firearm. Additionally, Ballman and Adkins sat at the table with Lockhart during the interview, and neither of them stood in front of the door to the break room so as to block her exit. In fact, several people entered the break room through that door as the interview was being conducted. *Craighead* is clearly distinguishable.

The final case cited by Lockhart as to the number of agents involved is *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004), in which six officers conducted a search at the apartment owned by the defendant's mother, where the defendant was residing. *United States v. Newton*, 369 F.3d 659, 663 (2d Cir. 2004). The officers handcuffed the defendant without advising him of his *Miranda* rights. *Id.* One of the officers told the defendant "he was not under arrest but was being restrained for his own safety as well as that of the officers." *Id.* The court found that the use of the handcuffs resulted in the defendant being placed in custody for the purpose of *Miranda*, noting "a reasonable person would also have understood that as long as the handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest." *Id.* at 677. Lockhart, by contrast, was not handcuffed or restrained in any way.

Next, Lockhart also argues that the isolated manner in which the interviews were conducted supports a finding that she was in custody. D.E. 123 at 8. She claims that the employees were isolated from one another and interviewed in "a police-dominated atmosphere" and therefore "[felt] coerced into answering questions." *Id.* (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012)) (internal quotation marks omitted). She cites to a string of cases finding that

interviews conducted in isolation were custodial.  *Id.*  Importantly, however, other coercive aspects of each of these cases led the courts therein to ultimately find custodial interrogation.

In *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002), the defendant, a Korean store-owner who had difficulty speaking English, was interviewed in isolation and prevented from speaking to her husband or son.  *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002).  In fact, when she was allowed to enter her store and her husband attempted to enter the store behind her, "the officer quickly shut the door in front of him and locked it from the inside.  Kim's husband knocked on the door again, but no one answered, so he waited—for about three hours—in the parking lot outside the store."  *Id.* at 971.  The officers told Kim's son not to communicate with her, and when she called out for him, one officer told her to "speak English, not Korean," and another ordered her to "shut up."  *Id.*  The court pointed to the defendant's limited English as a particularly important factor to the court's determination that she was in custody, noting, "the coercive impact of enforced isolation is particularly strong where the defendant may have had some difficulty in understanding English."  *Id.* at 977 (internal quotation marks and citation omitted).  The court stated: "[T]he police kept Kim physically isolated from two family members who could have provided both moral support and, given her limited English, a more complete understanding of the overall situation."  *Id.*  Lockhart was obviously not isolated to this extent and was even allowed to speak with her brother during her interview.

In *United States v. Daubmann*, 474 F. Supp. 2d 228 (D. Mass. 2007), cited in *United States v. Hamilton*, No. 5:11-CR-00045-R, 2012 WL 1029450 (W.D. Ky. March 26, 2012), IRS agents arrived at the defendants' residence at 6:50 a.m. to execute a search warrant, got the defendants out of bed, did not allow them to change into regular clothes, and accompanied at least one of the defendants to the restroom.  *United States v. Daubmann*, 474 F. Supp. 2d 228,

230-32 (D. Mass. 2007).  When one of the defendants attempted to leave the drawing room where he was being interviewed to inform his wife—who was then still asleep—of the agents' presence, the agents physically blocked the doorway and ordered the defendant to remain.  *Id.* at 231.  Certainly Lockhart's situation is distinguishable.  She was interviewed at a normal time of day, in ordinary clothes, at her place of employment, and no agent attempted to physically block her exit from the interview room.

Finally, with respect to her isolation argument, in *United States v. Steele*, 648 F. Supp. 1375 (N.D. Ind. 1986), the defendant, a postal service employee, was questioned in a small room at the back of the post office by two postal inspectors.  *United States v. Steele*, 648 F. Supp. 1375, 1376-78 (N.D. Ind. 1986).  The inspectors "almost immediately confronted [the defendant] with the accusation of [a] money shortage" at a post office service window.  *Id.* at 1378-79.  Unlike Lockhart, the defendant was never informed that she was free to leave or that she did not have to answer any questions, and one of the inspectors sat between her and the door to the room, which was closed.  *Id.* at 1378.  These are critical differences.

Lockhart also contends that the agents controlled her movements and ordered her where to go.  D.E. 123 at 9.  She points out that Amos Adkins admitted that Ballman "took" her to go speak with her brother.  *Id.*  However, this isolated description does not weigh heavily in the analysis of whether Lockhart was in custody.  Her brother was also being questioned, so it was reasonable that an agent would accompany her when interrupting his interview.  At no other point did the agents "take" Lockhart anywhere, the door to the break room was not locked, and Ballman specifically informed her that she was free to go at anytime.

Lockhart argues that Magistrate Judge Atkins recently found a defendant to be in custody in "a similar case."  D.E. 123 at 9.  However, a review of the case, *United States v. Mullins*,

19

Crim. Action No. 11-04-ART, 2011 WL 1327030 (E.D. Ky. March 21, 2011), reveals that it is in fact quite different from the case herein.  In *Mullins*, the defendant was immediately handcuffed, the officers accompanied him to the restroom without removing the handcuffs, and one of the officers told the defendant "he was 'familiar' with [the defendant's] prior record," and that if the defendant did not cooperate he would go to jail.  *United States v. Mullins*, Crim. Action No. 11-04-ART, 2011 WL 1327030, *1 (E.D. Ky. March 21, 2011).  Even though the handcuffs were eventually removed, the other circumstances in *Mullins*—particularly the fact that the officers accompanied him to the restroom and told him he would go to jail if he did not cooperate—were far more coercive than the environment in which Lockhart was interviewed.

Finally, Lockhart argues that it was reasonable for her to believe she was not free to go because "[n]one of the other employees left before [their] interviews had finished.  Five employees could not have all been unreasonable.  The one employee who did ask questions—Ms. Adkins—was warned [   ] not to end up like Martha Stewart, imprisoned for obstruction of justice."  D.E. 123 at 9.  However, the actions of other pharmacy employees, including Ms. Adkins, have no bearing on whether Lockhart was in custody because Lockhart admitted she "had no idea where anyone was except [her] brother."  Tr. 2 at 179:11-14.  Because Lockhart was unaware of the circumstances in which other interviews were conducted (with the exception of Huffman) this information is irrelevant to whether a reasonable person in Lockhart's position would have felt free to leave.  Notably, although the defense presented detailed testimony from Ms. Adkins, with the exception of this "Martha Stewart" reference, none of Ms. Adkins's testimony is relied upon in any significant way in Lockhart's post-hearing memorandum.

For the above reasons, the Court finds that Lockhart was ***not*** in custody when she was interviewed by Ballman and Amos Adkins on February 8, 2012.  Therefore, the agents were not

20

obligated to inform Lockhart of her *Miranda* rights, and her subsequent statements should not be suppressed.

### D. Marrowbone's Motion to Join

Defendant Marrowbone Hometown Pharmacy, Inc. has filed a Motion to Participate in Suppression Hearing and to Suppress Statements of Beverly Lockhart, effectively seeking to join in Lockhart's motion. D.E. 114. At the January 15, 2013 suppression hearing, the Court granted Marrowbone until January 28, 2013, to file additional briefing on its Motion, and granted the United States until January 30, 2013, to respond. D.E. 116. On January 28, Marrowbone filed a supplemental brief in which it noted that it rests on its previous memorandum (D.E. 114) and its oral argument in support of its Motion at the January 15, 2013 hearing. D.E. 124.

As an initial matter, Marrowbone sought leave to participate in the January 15, 2013 hearing on Lockhart's Motion to Suppress, arguing that under the Sixth Amendment, Marrowbone has the right to be confronted with the witnesses against it. D.E. 114-1 at 2. Marrowbone noted that should a declarant who testified at the suppression hearing subsequently become unavailable for trial, the declarant's testimony at the suppression hearing *may* be admissible against Marrowbone at trial. *Id.* Therefore, Marrowbone argued, it must be afforded the opportunity to cross-examine witnesses who testify at the suppression hearing. *Id.* Because Marrowbone's Motion to Participate was filed the day before the hearing, leaving insufficient time for a response from the United States and a ruling by the Court prior to the hearing, the Court deferred its decision on Marrowbone's Motion, but allowed Marrowbone to question the Government's witnesses at the January 15 hearing as a precautionary measure. Tr. 2 at 22:10-16; D.E. 116.

Both in its Motion to Participate (D.E. 114) and at the January 15 hearing, Marrowbone

set forth its arguments in support of its motion to join in Lockhart's Motion to Suppress. Marrowbone seeks leave to participate in the instant suppression motion asserted by Lockhart, moves to suppress the statements of Lockhart as a corporate officer of Marrowbone, and adopts and reasserts Lockhart's arguments in her Motion to Suppress.  D.E. 114-1 at 1.  Because Lockhart is a corporate officer of Marrowbone (and, in fact, the only remaining corporate officer), Marrowbone predicts that the Government will attempt to convict Marrowbone based at least in part on the statements of Lockhart.  *Id.* at 4. Marrowbone contends "in this context, Lockhart *is* Marrowbone."  *Id*.  Therefore, Marrowbone argues that it has a Fifth Amendment due process right to join in Lockhart's Motion to Suppress such statements.  *Id.*

Marrowbone, however, provides the Court with no supporting authority.  Of course, like any criminal Defendant, Marrowbone has the right to a fair trial.  However as the Court has previously noted (*see* D.E. 108 at 2), the United States Supreme Court has stated that "the privilege against self-incrimination is a purely personal one, [and] it cannot be utilized by or on behalf of any organization, such as a corporation."  *United States v. White*, 322 U.S. 694, 699 (1944).  The Court has invited the presentation of authority conferring standing on Marrowbone to join in Lockhart's motion to suppress, *see* D.E. 108 at 2; however, Marrowbone has provided none.[5]  Marrowbone has established no right to seek suppression of Lockhart's statements, and Marrowbone's joinder request could be denied on that basis alone.  Alternatively, Marrowbone

---

[5]      Marrowbone cites to *Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876 (2010), in which the Supreme Court stated, "The Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'"  D.E. 114-1 at 3, n.2 (citing *Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876, 900 (2010)).  Marrowbone argues this case represents a growing trend recognizing that corporations enjoy many of the same privileges as natural persons.  Marrowbone has failed, however, to direct the Court to a similar case in the Fifth Amendment context, or to provide any authority that contradicts *White*.

merely adopts the argument made by Lockhart, which the Court rejects herein.  Thus, even if Marrowbone has standing, suppression is not warranted.  Marrowbone's motion seeking to join in Lockhart's motion should therefore be denied.

## II.  RECOMMENDATION

For the reasons discussed herein, the Court **RECOMMENDS** that the District Court **DENY** Lockhart's Motion to Suppress (D.E. 90).  The Court also **RECOMMENDS** that the District Court **DENY** Marrowbone's Motion to Participate in Suppression Hearing and to Suppress Statements of Beverly Lockhart (D.E. 114).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning the recommendations above, issued under subsection (B) of that statute.  As defined by section 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within fourteen days after being served with a copy of this Recommended Disposition, any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 5th day of March, 2013.

Signed By:

_Hanly A. Ingram_

United States Magistrate Judge